IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br><br><br>        vs.<br><br><br>HEDTHEL MAURICIO CORLETO,<br>        Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS<br><br><br><br><br>Case No. 2:08-CR-585 TS |

        This matter comes before the Court on Defendant's Motions to Suppress.  Defendant has

filed one Motion seeking to suppress statements made by him (the "Statement Motion")[1] and

another Motion seeking to suppress evidence derived from the execution of two search warrants

(the "Warrant Motion").[2]  The Court conducted an evidentiary hearing on the Motions on

December 4, 2008.  The Motions are fully briefed and ripe for decision.  For the reasons set out

below, the Court will deny both Motions.

---

        [1]Motion to Suppress and Notification of Oral Testimony (Docket No. 21).

        [2]Motion to Suppress Evidence Derived from Execution of Search Warrants (Docket No. 22).

I.  FINDINGS OF FACT

A.    THE HOME SEARCH WARRANT

Agent Minichino, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), began to investigate Defendant after receiving a bulletin that Defendant had purchased two or more handguns within a five-business-day period.  On August 12, 2008, Agent Minichino applied for a search warrant.  In support of the search warrant, Agent Minichino submitted an affidavit.  The affidavit contained the following information.[3]

In the fall of 2007, Defendant purchased 16 Glock pistols within a three-day period. Defendant spent approximately 15% of his annual salary in this three-day period on the firearm purchases.  On the same day that he purchased the last of the Glock pistols, October 1, 2007, Defendant traveled to Guatemala.  Defendant had visited Guatemala on at least two prior occasions in 2007.  According to the Federal Licensing System, the ATF database for firearms licenses, Defendant was not a licensed manufacturer, importer, or dealer of firearms in the United States.

Based on this information, Agent Minichino initiated an investigation of financial records pertaining to Defendant.  These records revealed an apparent pattern of purchasing firearms, ammunition, firearms accessories, and/or firearms range time in close proximity to or on the actual date of international travel to Guatemala by Defendant.  Additionally, these records showed a pattern of international calls to Guatemala on or around the dates of purchase along

---

[3]This information is taken from the affidavit attached to Defendant's Memorandum in Support of his Motion to Suppress Evidence Derived from Execution of Search Warrants.  *See* Docket No. 23, Ex. 1.

with numerous deposits of cash and cashier's checks, independent of Defendant's salary, into his checking account.

Agent Minichino also obtained seven ATF Firearms Transaction Records—often referred to as 4473s—from the licensed firearms dealers who sold Defendant the guns.  On each of the 4473s, Defendant listed the address contained in the search warrant as his address.  Additionally, on each 4473 Defendant answered "Yes" to a question asking "are you the actual buyer of the firearm(s) listed on this form?"

Agent Minichino conducted interviews with the licensed firearm dealers who sold Defendant the firearms.  Dealer Wallin indicated that Defendant was very specific in which Glock pistols he desired to purchase and Mr. Wallin was under the impression that Defendant was amassing a group of Glocks for himself.  Dealer Pappas stated that Defendant had come into the store more than once in order to negotiate and order specific Glocks.  Mr. Pappas indicated that Defendant had visited other stores and used the prices given at other stores in order to get a better deal.  Similar to Wallin, Pappas felt that Defendant was amassing a group of Glocks for himself.

On July 16, 2008, Agent Minichino was informed that one of the Glocks purchased by Defendant had been recovered by Guatemalan authorities.  The Glock purchased by Defendant on October 1, 2007, had been recovered in April 2008 in some type of shooting incident.

Agent Minichino took steps to ensure that Defendant resided at the address listed on the 4473 forms.  During that investigation, Agent Minichino learned that Defendant was the documented owner of the property and that Defendant had two vehicles registered with the State of Utah at that same address.

The above information was provided to the magistrate judge in the form of an affidavit.

The magistrate judge issued a search warrant authorizing the search for and seizure of:

Records indicating the purchase, sale, or transfer of any weapon or ammunition, including but not limited to ATF Form 4473, *Firearms Transaction Record*, BCI background check forms, invoices, or bills of sale.

Firearms, ammunition, firearms accessories, or any other type of weapons found to be used in the furtherance of any crime.

Firearms manuals, boxes, and cases.

Any and all documents, whether stored magnetically, electronically or on paper, including but not limited to: contracts, purchase orders, requests for quotes and quotations associated with the purchase, acquisition, disposition, bartering, and sale of firearms.

Any and all documents, notes or papers, regardless of whether stored magnetically, electronically or on paper, pertaining to telephone logs, faxes, telexes, debit and credit notes and memos, general and subsidiary ledgers, invoices, bills of lading, packing and shipping documents, purchase orders and contracts which relate in anyway to HEDTHEL CORLETO or other conspirators purchasing, acquiring, selling, transferring firearms.

Any and all documents, notes, or papers, whether stored magnetically, electronically or on paper, pertaining to: applications, licenses, regulations, rules or requirements, and information bulletins, or any other Department which is involved in export regulation.

Any and all documents, notes, or papers, whether stored magnetically, electronically or on paper, pertaining to travels by HEDTHEL CORLETO or other conspirators.

Currency, checks, cashier's checks and/or traveler's checks believed to be proceeds of illegal firearm trafficking.

Residency papers, to include but not limited to utility bills, court papers, citations, and correspondences.

Notes, documents, or papers involving instructions, pictures, and/or references to trafficking firearms or circumventing firearms laws.

Any other fruits and instrumentalities consisting of evidence of illegal possession, transfer, exportation of firearms, and possession of illegal firearms.

4

Materials used for packaging or concealing firearms in shipments through common carriers including tape, boxes, bubble wrap, and packing paper.[4]

B.    THE SEARCH AND INTERVIEW

The search warrant was executed on the morning of August 14, 2008.  At approximately 6:00 a.m., a group of 14 officers executed the search warrant.  When the team arrived at Defendant's residence, Agent Minichino knocked on the front door.  Before long, a male voice responded, saying "What's going on?"[5]  Agent Minichino responded stating "Police with a search warrant, come to the front door."[6]  Agent Minichino heard a male voice through the front door and told the person "Come to the front door with your hands up, police with a search warrant."[7]

Defendant and his wife came to the front door with their hands up.  Defendant and his wife were brought out of the residence and Defendant was then placed in handcuffs.  Defendant's wife informed the officers that their two children were inside the home.  Defendant's wife, accompanied by two officers, was allowed to go inside to get the children and they were brought outside as well.  At this point, the officers cleared the house.  As soon as the house was cleared, everyone was brought back into the house.

When Defendant was brought back into the house, he was taken into an office where a Fort Knox safe had been located.  Defendant was shown the search warrant and was asked to open the safe.  From the safe, the officers seized three rifles, one pistol, two hard case luggage

---

[4]*Id*. at Attachment A.

[5]Docket No. 38, at 16:15-26.

[6]*Id*. at 16:18-19.

[7]*Id*. at 16:19-22.

pieces, gun receipts, travel documents to Guatemala, and a number of notebooks.  The officers also seized a computer and an iPhone from the office.  The officers did not locate the 16 Glocks which Defendant had purchased.

During the search, which lasted approximately 50 minutes, Defendant continually asked the officers what this was about, what was going on, and if he was in trouble.  Agent Minichino would respond by showing Defendant a copy of the search warrant, informing him of the items the officers were looking for, and stating that he would talk more formally with Defendant in a moment.

Once the safe was searched, Agent Minichino and another agent took Defendant downstairs to conduct an interview.  Defendant remained handcuffed throughout the search and during the interview.  Defendant was curious about what was going on and was trying to ask the officers questions.  In response to his questions, Agent Minichino asked Defendant it he would be willing to answer questions and Defendant stated that he would.  Agent Minichino then read Defendant his *Miranda*[8] rights and provided Defendant a form to waive those rights.  Defendant was apprehensive to sign the waiver form.  Agent Minichino informed Defendant that he did not have to sign the form, but could still answer questions.  Defendant indicated that he was willing to answer questions, but refused to sign the form.  Agent Minichino indicated on the form that Defendant refused to sign it.

Agent Minichino then asked Defendant "What did you do with the 16 Glocks that you bought in the autumn of 2007?"[9]  In the same breath, Defendant stated "I sold them, I think I

---

[8]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[9]Docket No. 38 at 43:9-10.

want a lawyer."[10]  Agent Minichino sought clarification as to whether Defendant was invoking

his right to counsel.  When Defendant indicated that he did not want to continue questioning and

wanted a lawyer, questioning stopped.  At some point, Task Force Officer Davis obtained verbal

consent from Defendant to search two cars located in the garage[11] and the cars were searched.

C.      THE COMPUTERS AND PHONE WARRANT

As set forth above, two computers and an iPhone were seized during the search.  Those

items were turned over to Special Agent Bridge, with the United States Department of Homeland

Security.[12]  On August 20, 2008, Special Agent Bridge conducted a search for images on the two

computers seized in the investigation.  Special Agent Bridge located photographs on the

computers of various firearms, some of which were taken in and around the office desk and safe

located in Defendant's home.  The search also revealed a photo taken by the iPhone of Defendant

wearing a holstered pistol that appeared to be a Glock pistol.

Based on this evidence, on September 4, 2008, Special Agent Bridge applied for a search

warrant to conduct a search of the computers and iPhone believing that they may contain

evidence of a violation of various federal firearms statutes.  The affidavit in support of the

warrant contained much of the same information as the previous affidavit, but contained

additional information about how the computers and iPhone had been seized during the August

---

[10]*Id*. at 25:22-23; *id*. at 44:7-8.

[11]*Id*. at 20:9-17.

[12]This information is taken from the affidavit attached to Defendant's Memorandum in Support of his Motion to Suppress Evidence Derived from Execution of Search Warrants.  *See* Docket No. 23, Ex. 2.

14, 2008 search of Defendant's home and the preliminary search of the computers on phone conducted by Special Agent Bridge.

The magistrate judge issued the warrant permitting the officers to search the computers and iPhone for:

> 1.    <u>Computer Hardware</u>: Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, video recording devices, video recording players, monitors and or television, and data were instrumentalities of and will contain evidence related to this crime. . . .

> * * *

> 2.    Any and all notes, documents, records, or correspondence pertaining to firearm purchases, transfers, sales, shipments and exports.

> 3.    Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer for the purpose of firearm purchases, transfers, sales, shipments and exports.

> 5.    Any and all records, documents, invoices and materials that concern any accounts with Comcast, or any other Internet Service Provider which may have been used.

> 7.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce or foreign commerce a firearm.

> 8.    Any and all documents, records, or correspondence pertaining to occupancy at [Defendant's home address] only insofar as needed to establish CORLETOS occupancy therein.

> Any and all documents, whether stored magnetically, electronically or on paper, including but not limited to: contracts, purchase orders, requests for quotes and quotations associated with the purchase, acquisition, disposition, bartering, and sale of firearms.

> Any and all documents, notes or papers, regardless of whether stored magnetically, electronically or on paper, pertaining to telephone logs, faxes, telexes, debit and credit notes and memos, general and subsidiary ledgers,

invoices, bills of lading, packing and shipping documents, purchase orders and contracts which relate in any way to HEDTHEL CORLETO or other conspirators purchasing, acquiring, selling, transferring firearms.

Any and all documents, notes, or papers, whether stored magnetically, electronically, or on paper, pertaining to: applications, licenses, regulations, rules or requirements, and information bulletins, or any other Department which is involved in export regulation.

Any and all documents, notes, or papers, whether stored magnetically, electronically or on paper, pertaining to international travels by HEDTHEL CORLETO or other conspirators.

Notes, documents, or papers involving instructions, pictures, and/or references to trafficking firearms or circumventing firearms laws.

Any other fruits and instrumentalities consisting of evidence of illegal possession, transfer, exportation of firearms, and possession of illegal firearms.

Any of the items described in paragraphs 1 through 8 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer related equipment, including floppy diskettes, fixed hard disks, or removable hard disk cartridges, software or memory in any form.[13]

## II.  DISCUSSION

A.    THE STATEMENT MOTION

Defendant argues that his statement—"I sold them, I think I want a lawyer"—should be suppressed because Defendant did not waive his *Miranda* rights.

"If a defendant talks to police after being advised of his right to remain silent, the government bears the burden of proving by a preponderance of the evidence that the waiver of

_____

[13]*Id*. at Attachment A.

the right was voluntary."[14]  "An express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words."[15]

> To establish a voluntary waiver of Fifth Amendment rights, the government must show (1) that the waiver was the product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving.[16]

"Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective."[17]  "To evaluate whether a statement or confession was coerced, we consider the characteristics of the defendant, the circumstances surrounding the statements, and the tactics employed by the police."[18]

Here, the government has presented evidence that Defendant knowingly and voluntarily waived his Fifth Amendment rights.  As set forth above, Agent Minichino asked Defendant if he would be willing to answer questions and Defendant stated that he would.  Agent Minichino then informed Defendant of his *Miranda* rights and provided Defendant a form to waive those rights. Defendant refused to sign the form, but he indicated that he was willing to answer questions. Though Defendant never expressly stated that he waived his rights, his willingness to answer

---

[14]*United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 168 (1986)).

[15]*Id*. (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

[16]*Id*. (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

[17]*Id*.

[18]*Id*. at 825-26.

questions after being advised of his rights shows a clear waiver of his Fifth Amendment rights.[19] The fact that Defendant refused to sign the waiver does not alter this conclusion.[20]

Further evidence supports the Court's conclusion that the waiver was knowing and voluntary. Agent Minichino read Defendant his rights from a standard form. Having reviewed the form, the Court finds that the *Miranda* warning given to Defendant was adequate. There is nothing in the record to suggest that Defendant did not understand his rights as Agent Minichino read them. Even though Defendant did not affirmatively state that he understood his rights, Defendant indicated a willingness to talk to Agent Minichino after being informed that he had the right to remain silent and the right to counsel. Defendant's understanding of his rights is underscored by the fact that shortly thereafter he invoked those rights.

There is nothing to suggest that the interview was coercive or intimidating. While it is true that Defendant was handcuffed during the interview, the interview took place in an open area of Defendant's home and was conducted in a conversational manner. And though there is evidence that the officers were armed, there is no evidence that these weapons were ever displayed during the interview. There is no evidence that Defendant was ever threatened by the officers. Further, when Defendant asked for an attorney and requested that questioning stop, Agent Minichino honored that request once he was certain that Defendant was unequivocally invoking his rights. Finally, there is nothing to indicate that Defendant was ever deceived into making any statements.

---

[19] *See United States v. Gell-Iren*, 146 F.3d 827, 830 (10th Cir. 1998) ("While a waiver of rights must be clear, it does not have to be express.").

[20] *See Butler*, 441 U.S. at 373; *see also United States v. Yazzie*, 188 F.3d 1178, 1193 (10th Cir. 1999) (stating that the defendant's refusal to sign waiver form was clearly overridden by his verbal indication that he understood his rights and was willing to talk).

11

Based on the totality of the circumstances, the Court finds that Defendant waived his Fifth Amendment rights and that his waiver was knowing, voluntary, and intelligent.  Therefore, the Court finds that there is no violation of *Miranda* and his statement need not be suppressed.[21]

B.     THE WARRANT MOTION

Defendant argues that the search warrant for his home was not supported by probable cause, the home warrant was overly broad, the officers violated the scope of the warrant, the computer and phone warrant was tainted and overbroad, and the good faith exception does not apply.  The Court will address Defendant's arguments in the context of each warrant.

    *1.     The Home Warrant*

        *a.     Probable Cause*

Defendant argues that the home warrant lacked probable cause because it failed to establish the requisite nexus between the place to be searched and the items sought in the warrant or the suspected criminal activity.  The Court need not address whether the warrant was sufficiently supported by probable cause because, even if it was not, suppression is not the appropriate remedy.  "In reviewing suppression motions, courts have the discretion to proceed directly to an analysis of the good-faith exception without first addressing the underlying Fourth Amendment question."[22]  In this case, the Court will proceed to discuss the good-faith exception set out in *United States v. Leon*.[23]

---

    [21]Defendant's argument that his invocation of his right to counsel should not be introduced at trial is better addressed in a motion in limine.  Therefore, the Court will not decide that issue at this time.

    [22]*United States v. Danhauer*, 229 F.3d 1002, 1005 (10th Cir. 2000).

    [23]468 U.S. 897 (1984).

In *Leon*, the Supreme Court adopted a good-faith exception to the exclusionary rule where "officers reasonably [rely] on a warrant issued by a detached and neutral magistrate" later found to be invalid.[24]  The Court held that the purpose of the exclusionary rule is to deter police misconduct and that the suppression of evidence obtained pursuant to a warrant should be ordered only in the unusual case in which exclusion will further the purposes of the exclusionary rule.[25]  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."[26]

The Court, however, recognized four situations where the good-faith exception would not apply.

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.  The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role . . . . Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.[27]

Defendant argues that *Leon* in not applicable because the warrant was so facially deficient and was based on an affidavit so lacking in indicia of probable cause that the executing officers

---

[24]*Id*. at 913.

[25]*Id*. at 918.

[26]*United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

[27]*Leon*, 468 U.S. at 923 (internal quotation marks and citations omitted).

13

could not reasonably presume it to be valid.  Further, Defendant argues that *Leon* is inapplicable because the officers violated the scope of the warrant.

Defendant first argues that the home warrant is so facially deficient or is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  Defendant's primary argument is that there was an insufficient nexus between Defendant's residence and the items sought in the warrant or the suspected criminal activity.

"'Probable cause undoubtedly requires a nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched.'"[28]  "Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity."[29]  Defendant points to *United States v. Rowland* to support his argument that the affidavit lacked probable cause.

In *Rowland*, the defendant filled out and mailed a questionnaire expressing an interest in child pornography.[30]  In the questionnaire, the defendant gave his name and the address of a private post office box.[31]  About three years later, the defendant was targeted in a child pornography sting.[32]  Officers mailed to the defendant's private post office box a brochure

---

[28]*United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998) (quoting *United States v. Corral-Corral*, 899 F.2d 927, 937 (10th Cir. 1990)).

[29]*Id*. at 1204.

[30]*Id*. at 1198-99.

[31]*Id*. at 1199.

[32]*Id*.

advertising "forbidden lifestyles" which included a telephone number and an e-mail address.[33] The defendant called the telephone number and left a message indicating an interest in young girls, video tapes, magazines, and possibly meetings.[34]  The defendant left the telephone number of a public pay phone and left the address of his private post office box.[35]

In response to this telephone message, officers sent the defendant a letter thanking him for calling the "Family Affairs Hotline."[36]  The letter contained descriptions and prices of nine sexually explicit video tapes, referred to the availability of a wide variety of foreign and domestic magazines, and contained an order form.[37]  The following day, the defendant mailed an order for two video tapes, along with a money order, and requested information about the magazines.[38]

After receiving the order form, officers conducted surveillance of the defendant's post office box to determine his identity and to determine where he went after collecting his mail.[39] The officers obtained a description of the defendant, learned where he worked, and determined his home address.[40]

The government applied for and a magistrate judge issued an order for the installation of a mobile tracking device in a package containing the two ordered video tapes to be delivered to

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]*Id.*

[39]*Id.*

[40]*Id.*

the defendant's post office box.[41]  The government also obtained an anticipatory warrant to

search the defendant's residence.[42]  That warrant allowed the officers to search the defendant's

residence once the package containing the video tapes was brought into the residence.[43]

The defendant challenged the anticipatory warrant arguing that it lacked probable cause

because the supporting affidavit failed to establish a nexus between his residence and the

contraband or suspected criminal activity.[44]  The defendant argued that although his private post

office box had been linked to suspected criminal activity, the warrant affidavit failed to establish

any link between such activity and his home.[45]

The Tenth Circuit agreed.  The court noted:

Only an oblique reference was made in the affidavit to the anticipated route of the
contraband after its delivery to Rowland's post office box.  The affidavit stated:
"It is anticipated that [Rowland, after picking up the tapes from the post office
box,] will go to his place of employment and after work to his residence."  The
affidavit contained no information suggesting that Rowland had previously
transported contraband from his private post office box to his home or that he had
previously stored contraband at his home.  Nor did the affidavit provide any facts
linking Rowland's residence to suspected illegal activity, such as in the past
having similar video tapes or other illegal materials delivered directly to his
home.[46]

The court held that "[g]iven the absence of any facts in the affidavit linking the contraband to

Rowland's home, the magistrate had no information from which to determine, at the time he

---

[41]*Id.*

[42]*Id.*

[43]*Id.*

[44]*Id.* at 1203.

[45]*Id.*

[46]*Id.* at 1204.

issued the warrant, there was probable cause to believe the contraband would be at Rowland's residence when the search was to take place."[47]  Therefore, the court concluded that the warrant was not supported by probable cause.[48]

This did not end the court's inquiry, however.  The court went on to determine whether the *Leon* good-faith exception could be applied.[49]  As here, the defendant in *Rowland* argued that the good-faith exception did not apply.[50]  The court disagreed.[51]  The court held that

> [a]lthough the affidavit did not establish a sufficient nexus between the contraband and Rowland's residence to provide probable cause to search, the warrant and supporting affidavit were not so facially deficient or so lacking in indicia of probable cause that the officers' reliance on the warrant in conducting the search was objectively unreasonable.[52]

The court noted that "the affidavit as a whole was not a bare bones affidavit, containing only conclusory statements and completely devoid of factual support."[53]  Rather,

> the affidavit contained information detailing the investigation into Rowland's suspected criminal activity.  The affidavit linked Rowland to the contraband and indicated Rowland was likely to pick up the video tapes at his post office box and take them back to his workplace.  The affidavit also provided information from which it could reasonably be inferred that Rowland would not leave the video tapes at work, but would take them elsewhere, possibly his home, to view or store.[54]

---

[47]*Id*. at 1205-06.

[48]*Id*. at 1206.

[49]*Id*.

[50]*Id*. at 1207.

[51]*Id*.

[52]*Id*.

[53]*Id*.

[54]*Id*.

Because of these findings, the court held that the evidence seized at the Defendant's home pursuant to the warrant need not be suppressed.[55]

*Rowland* is instructive here.  As with the affidavit in *Rowland*, the affidavit here detailed Agent Minichino's investigation of Defendant and contained sufficient information linking Defendant to criminal activity.  While the affidavit in *Rowland* contained only an oblique reference to the defendant's home, the affidavit in this case does substantially more.  The affidavit referenced the 4473 forms that Agent Minichino had collected.  On each of those forms, Defendant had provided his home address and had indicated that he was the purchaser of the firearms.  Additionally the affidavit contained information that those who sold Defendant the firearms were left with the impression that Defendant was amassing a group of firearms for himself.  The affidavit also detailed steps Agent Minichino had taken to verify that the address listed on the 4473s was indeed Defendant's residence.

The Court need not decide whether the affidavit provided a sufficient nexus between the contraband to be seized or suspected criminal activity and the place to be searched to support a finding of probable cause.  But the Court finds that, like the affidavit in *Rowland*, the warrant and supporting affidavit here were not so facially deficient or so lacking in indicia of probable cause that the officers' reliance on the warrant in conducting the search was objectively unreasonable.

The case of *United States v. Gonzales*[56] is similarly helpful in determining when application of the good-faith exception is not appropriate.  In *Gonzales*, the officers applied for a

---

[55]*Id*. at 1208.

[56]399 F.3d 1225 (10th Cir. 2005).

search warrant to search the defendant's residence for firearms and ammunition after the defendant had been involved in a one-car accident and an inventory search revealed a Glock 10mm magazine, but no matching weapon.[57]   The affidavit in support of the application identified "321 E. Church" as the place to be searched and detailed the defendant's accident and the resulting inventory search.[58]   The officer also stated that he had two years of law enforcement experience and that he knew from training and experience that firearms are often kept at residences as well as in vehicles.[59]   The affidavit did not, however, specify that 321 E. Church was the defendant's residence or that there was any other connection between that location and the defendant, the vehicle, or the suspected criminal activity.[60]   Nor did it explain why the officer thought the items to be seized would be located at the residence.[61]

The Tenth Circuit held that "the affidavit clearly lacked probable cause as it failed to establish any connection between the place to be searched and [the defendant] or the suspected criminal activity."[62]   The court went on to address the *Leon* good-faith exception.  The court held "that good faith may exist when a minimal nexus between the place to be searched and the suspected criminal activity is established."[63]   The court emphasized that

---

[57]*Id*. at 1227.

[58]*Id*. at 1227-28.

[59]*Id*. at 1228.

[60]*Id*.

[61]*Id*. at 1230.

[62]*Id*. at 1228.

[63]*Id*. at 1231.

> [f]or good faith to exist, there must be *some* factual basis connecting the place to be searched to the defendant or the suspected criminal activity. When this connection is wholly absent, the affidavit and resulting warrant are "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[64]

The court found that the affidavit in that case provided no such nexus and, therefore, the good-faith exception was not applicable.[65]

Unlike *Gonzales*, the affidavit here supplies the minimal nexus between the place to be searched and Defendant and the suspected criminal activity. As set forth above, the affidavit detailed Agent Minichino's investigation of Defendant. The affidavit referenced the 4473 forms that Agent Minichino had collected from those who had sold Defendant the firearms. On each of those forms, Defendant had provided his home address and had indicated that he was the purchaser of the firearms. Additionally the affidavit contained information that those who sold Defendant the firearms were left with the impression that Defendant was amassing a group of firearms for himself. The affidavit also detailed steps Agent Minichino had taken to verify that the address listed on the 4473s was indeed Defendant's residence. The court finds that this information provides the minimal nexus warranting application of the *Leon* good-faith exception.

        *b.*     *Particularity*

Defendant next argues that the home warrant was patently overbroad. The Fourth Amendment mandates warrants "particularly describ[e] the place to be searched, and the persons or things to be seized."[66] A warrant is sufficiently specific if it "enables the searcher to

---

[64]*Id*. (quoting *Leon*, 468 U.S. at 923).

[65]*Id*.

[66]U.S. Const. amend. IV.

reasonably ascertain and identify the things authorized to be seized."[67]  "[A] warrant that describes the items to be seized in broad or generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'"[68] "However, the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and the circumstances allow, and 'warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized.'"[69]

There is no argument here that the warrant fails to adequately describe the place to be searched.  The warrant and the affidavit make clear that Defendant's residence is the place to be searched and the warrant provides an adequate description of the residence.  Therefore, Defendant's only argument can be that the warrant fails to adequately describe the things to be seized.

As set forth above, the warrant specifically lists each of those items to be seized.  While that list contains a number of different items, ranging from firearms to travel documents, the warrant is specific enough to enable the officers conducting the search to reasonably ascertain and identify the things authorized to be seized and to prevent the officers "from generally rummaging through a person's belongings."[70]  Therefore, the warrant is not so overbroad that it

---

[67]*United States v. Robertson*, 21 F.3d 1030, 1033 (10th Cir. 1994).

[68]*United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988) (quoting *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985)).

[69]*Id.* (quoting *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir. 1987)).

[70]*United States v. Hargus*, 128 F.3d 1358, 1362 (10th Cir. 1997).

violates the Fourth Amendment.  Even if the warrant did not contain sufficient particularity, it is not so facially deficient that the officer's reliance on the warrant was objectively unreasonable.[71]

> ### c.    Exceed the Scope

Defendant also argues that *Leon* should not apply because the officers exceeded the scope of the home warrant.  In particular, Defendant argues that officers exceeded the scope of the warrant by searching two vehicles which were not mentioned in the warrant and by seizing materials which Defendant contends had no connection to the offense at issue.

In *Leon,* the Supreme Court stated that application of the good-faith exception assumes "that the officers properly executed the warrant and searched only those places and for those objects it was reasonable to believe were covered by the warrant."[72]  The Tenth Circuit has similarly held "that *Leon* does not apply to issues of improper execution of warrants."[73]

Defendant first argues that the officers exceeded the scope of the search warrant by conducting a search of two vehicles located in the garage of Defendant's home.  It is true that the warrant and the affidavit make no mention of the vehicles.  However, Agent Minichino testified that another officer obtained verbal consent from Defendant to search the two vehicles.[74]  Defendant does not argue that he did not give consent, but argues that the government cannot

---

[71]*Leon*, 468 U.S. at 923.  *See also Massachusetts v. Sheppard*, 468 U.S. 981, 988 (1984) (applying *Leon* good-faith exception to warrants that violate the Fourth Amendment's particularity requirement).

[72]*Leon*, 468 U.S. at 918 n.19.

[73]*United States v. Medlin*, 798 F.2d 407, 410 (10th Cir. 1986).

[74]Docket No. 38, at 20:9-17.

establish valid consent because the officers sought Defendant's consent after he had invoked his *Miranda* rights.

The Tenth Circuit has held "that a consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address."[75]  Therefore, the officer, in asking Defendant for his consent to search the vehicles, did not violate Defendant's rights.[76]  Without more, the Court cannot find that the officer's exceeded the scope of the warrant by searching two vehicles after receiving consent to search those vehicles.

Defendant next argues that the officers exceeded the scope of the warrant by seizing various materials that he contends had no connection to the offense at issue.  In particular, Defendant complains that the officers seized two computers, an iPhone, multiple legally purchased guns and ammunition, gun cases, $1,912 in cash, numerous documents, and other items.  However, as indicated above, the search warrant allowed officers to seize firearms, ammunition, and firearms accessories; firearm cases; currency, checks, cashier's checks and/or traveler's checks believed to be proceeds of illegal firearms trafficking; various documents relating to the purchase and sale of firearms (whether stored magnetically, electronically or on paper); documents relating to international travel; and other fruits or instrumentalities of illegal possession, transfer, exportation of firearms, and possession of illegal firearms.  The Court finds that each of the items Defendant argues were seized improperly were well within the scope of the

---

[75] *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir. 1993) (noting that "[e]very federal circuit court which has addressed the *Miranda* issue presented here has reached the conclusion that a consent to search is not an incriminating statement.").  *See United States v. Stevens*, 487 F.3d 232, 243 n.3 (5th Cir. 2007) (collecting cases).

[76] *See, e.g., United States v. Bustamante*, 493 F.3d 879, 892 (7th Cir. 2007) ("*Miranda* does not protect a defendant who is in custody from a police officer's request to search his vehicle . . . .").

warrant.  As the Court has already found that it was permissible for the officers to rely on the warrant, the Court cannot find that the officers exceeded the scope of the warrant by seizing these various items which fell within the scope of the warrant.

For the above stated reasons, the Court finds that the evidence seized under the home warrant need not be suppressed.

2.      *The Computers and Phone Warrant*

Defendant first argues that the warrant for the computers and phone was tainted as a result of the initial warrant.  As set forth above, the officers were justified in relying on the initial warrant.  Therefore, the Court finds this argument to be without merit.

Defendant also argues that the affidavit for the computers and phone warrant was tainted because it contained information obtained from a warrantless search of the computers and phone. The Court finds that no such warrantless search occurred here.  As noted above, the home warrant allowed for the search and seizure of a number of items regardless of whether they were stored magnetically, electronically, or on paper.  Based on this language, the Court finds that the officers had the ability to search for those items mentioned in the warrant that were electronically stored on the computers and phone.[77]  Further, the Court finds that even if the computer and phone warrant contained unconstitutionally obtained information, the Court would uphold that warrant because it is supported by probable cause absent that allegedly tainted information.[78]

---

[77]*United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001) (finding that officer could legally search a defendant's computer when "[a]rmed with a search warrant authorizing a search for electronic records of drug trafficking.")

[78]*See United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005) ("When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.").  *See also United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990) ("An affidavit containing erroneous or unconstitutionally obtained

Defendant finally argues that the computer and phone warrant is facially deficient because it is overbroad.  The Tenth Circuit, in *United States v. Carey*,[79] addressed the particularity requirement as it relates to the search of computer files.

> The underlying premise in *Carey* is that officers conducting searches (and the magistrates issuing warrants for those searches) cannot simply conduct a sweeping, comprehensive search of a computer's hard drive.  Because computers can hold so much information touching on many different areas of a person's life, there is a greater potential for the intermingling of documents and a consequent invasion of privacy when police execute a search for evidence on a computer.  Thus, when officers come across relevant computer files intermingled with irrelevant computer files, they may seal or hold the computer pending approval by a magistrate of the conditions and limitations on a further search of the computer.  Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant.[80]

Tenth Circuit case law "suggests that warrants for computer searches must affirmatively limit the search to evidence of specific federal crimes or specific types of material."[81]

Defendant focuses his attention on the first paragraph of Attachment A referenced in the search warrant for the computers and iPhone.[82]  Paragraph 1 of Attachment A lists the following as items to be seized and searched:

> Computer(s), computer hardware, software, related documentation, passwords, data security devices (as described below), videotapes, video recording devices,

---

information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.").

[79]172 F.3d 1268 (10th Cir. 1999).

[80]*Walser*, 275 F.3d at 986 (internal quotation marks and citations omitted).

[81]*United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005).

[82]Docket No. 23, Ex. 2, Attachment A.

> video recording players, monitors and or televisions, and data were
> instrumentalities of and will contain evidence related to his crime. . . .

The paragraph then goes on to provide definitions for various terms used in Attachment A.

Defendant correctly notes that Paragraph 1 in Attachment A does nothing to limit the scope of the search of the computers and the iPhone.  As a result, Defendant argues that the warrant is overbroad and the evidence recovered from those devices should be suppressed.

The Court agrees that Paragraph 1 of Attachment A is overbroad.  However, that paragraph cannot be read in exclusion of the remaining paragraphs.  Rather, Attachment A must be read as a whole.  When read as a whole, there are clear limits on what items can be searched and seized because the remaining paragraphs put specific limits on those items.  For example, Paragraph 2 provides for the search and seizure of "[a]ny and all notes, documents, records, or correspondence *pertaining to firearm purchases, transfers, sales, shipments and exports*."[83] Other paragraphs contains similar limitations.  When read as a whole, the warrant clearly limits the items which the officer can search and seize to evidence of specific federal crimes or specific types of material.

Defendant points to *United States v. Riccardi* in support of his argument that the warrant for the computers and iPhone was overbroad.  In *Riccardi*, the warrant authorized the seizure of the defendant's computer and the search of all electronic and magnetic media stored within such devices.[84]  The warrant did not specify the nature of the materials the officers should examine.[85] The Tenth Circuit found that the warrant was not limited to any particular files or to any

---

[83]*Id*. at ¶ 2 (emphasis added).

[84]405 F.3d at 858.

[85]*Id*.

particular federal crime and, thus, lacked the specificity required by Tenth Circuit precedent.[86]
Despite this, the court found that the *Leon* good-faith exception applied.[87]

    This case is more analogous to *United States v. Brooks*.[88]  In *Brooks*, as in *Riccardi*, the
defendant challenged the scope of the search warrant.[89]  The warrant in *Brooks* authorized
officers to search two computers and a number of disks for evidence of child pornography,
including photographs, pictures, computer generated pictures or images, depicting partially nude
or nude images of prepubescent males and or females engaged in sex acts, as well as
correspondence, including printed or handwritten letters, electronic text files, emails and instant
messages.[90]  The warrant, however, did not explicitly instruct the officers to look solely for those
text files containing child pornography.[91]  The court found that "although the language of the
warrant may, on first glance authorize a broad, unchanneled search through [the defendant's]
document files, as a whole, its language more naturally instructs officers to search those files
only for evidence *related to child pornography*."[92]

    A similar situation is presented here.  While at first blush the warrant authorizes the
officers to search Defendant's computer without restriction, the warrant, when read as a whole,

---

[86]*Id*. at 862-63.

[87]*Id*. at 863-64.

[88]427 F.3d 1246 (10th Cir. 2005).

[89]*Id*. at 1252.

[90]*Id*.

[91]*Id*.

[92]*Id*.

limits the search to those items pertaining to criminal activity for which Defendant was being investigated.  Therefore, the Court cannot find that the computer and phone warrant was overbroad.

Even if the warrant lacked sufficient particularity, the Court finds that the *Leon* good-faith exception applies here for many of the same reasons set out in *Riccardi*.  First, after the officers seized the computers and the iPhone and found that they might contain evidence of criminal activity, they obtained a second search warrant to conduct a search on these devices.  Second, the affidavit in support of the warrant limits the search to items related to illegal firearm trafficking.  Third, there is no evidence that the officers searched or seized any items that were unrelated to the crimes for which Defendant was being investigated.  For these reasons, the Court finds that even if the warrant for the computers and phone was overbroad, the officer's reliance on the warrant was not objectively unreasonable.

### III.  CONCLUSION

Based upon the foregoing, it is therefore

ORDERED that Defendant's Motion to Suppress and Notification of Oral Testimony (Docket No. 21) is DENIED.  It is further

ORDERED that Defendant's Motion to Suppress Evidence Derived from Execution of Search Warrants (Docket No. 22) is DENIED.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the new trial date of March 30, 2009, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

DATED   February 5, 2009.

BY THE COURT:

_____

TED STEWART
United States District Judge